843 So.2d 1202 (2003)
Phyllis PUGH, Plaintiff-Appellant,
v.
CASINO MAGIC, Defendant-Appellee.
No. 37,166-WCA.
Court of Appeal of Louisiana, Second Circuit.
April 11, 2003.
Rehearing Denied May 8, 2003.
Phyllis Pugh, In Proper Person.
Lunn, Irion, Salley, Carlisle & Gardner By: Richard B. King, Jr., Shreveport, for Appellee.
Before BROWN, GASKINS, and PEATROSS, JJ.
*1203 BROWN, C.J.
Plaintiff, Phyllis Pugh, filed a workers' compensation claim against her employer, Casino Magic. The Workers' Compensation Judge ("WCJ") found that plaintiff failed to prove that the on-the-job injury to her right knee was a direct cause of a subsequent left knee injury. Claimant now appeals. For the following reasons, we affirm.

Factual and Procedural History
Phyllis Pugh was employed by Casino Magic (now Boomtown Casino) in Bossier City, Louisiana. On June 18, 2000, she injured her right knee in the course of her work. Medical records show that she suffered a torn medial meniscus in her right knee. In October 2000, Dr. Thomas Edwards, an orthopedic surgeon, performed arthroscopic surgery. Casino Magic paid for this surgery and the related treatment.
In August 2000, Ms. Pugh attended "dealer school" at Hollywood Casino. She started working for Hollywood Casino as a dealer in December 2000. She worked eight-hour shifts at both standing and seated tables. When required to stand, she stood for approximately 40 minutes out of each hour.
On April 23, 2001, while getting off the employee shuttle bus at Hollywood Casino, Ms. Pugh slipped and fell. The report of the incident indicated that the steps on the bus were "slippery with rain" at the time. On April 26, 2001, she saw Dr. Goodman and reported localized pain in her back and right leg; the records indicated that she hit her back.
In late September 2001, Ms. Pugh's right knee buckled and caused her to fall to the ground; she did not fracture any bones. She went to the emergency room and had the leg X-rayed and splinted. On October 1, 2001, Dr. Edwards removed the splint and noted that her right knee was worse. No mention was made of any injury to her left knee.
On October 11, 2001, approximately 16 months after the on-the-job injury to her right knee, Ms. Pugh saw Dr. Edwards and complained of pain in her left knee. Dr. Edwards' notes from that date reflect, in part:
She also complains of some pain in her left knee. I feel that she has shifted some weight to the left side.
The doctor's November 19, 2001, notes reflect, in part:
[T]he left knee is actually worse. Exam. today shows crepitation to the left knee with anterio-medial tenderness and I still think her standing at work has an adverse effect on both knees.
Ms. Pugh continued to have pain in her left knee. On December 6, 2001, Dr. Edwards again noted that "she is doing worse in regard to her left knee;" he treated this by draining fluid off the knee and injecting it with Lidocaine and a steroid. Casino Magic, through its third party compensation claims administrator, Management Services, Inc. ("MSI"), paid for this treatment. Diane Keeler, the claims representative for MSI, said that she paid for the treatment because the doctor also treated Ms. Pugh's right knee on that date, and Ms. Keeler felt that the left knee treatment would be related. Ms. Keeler also said that it was "next to impossible" for her to separate the charges between the two ailments.
On January 8, 2002, Dr. Edwards noted that Ms. Pugh had probably reached maximum medical improvement in her right knee. The doctor also observed:
I feel that in all likelihood, the problems with her left knee are secondary to increased pressure that she put on her left knee. She has been treated for bursitis in the past for her left knee. I *1204 do not think the problem that she is having now is secondary to bursitis, but rather some chondromalacia of the patella and some degenerative disease in the sub-patella area, secondary to additional stress. I feel that, additionally, she will require arthroscopic debridement of her left patella, if her symptoms persist as they have over the last six months.
The doctor's January 14, 2002, progress notes indicate that Ms. Pugh was considering having surgery on her left knee pending insurance approval. On January 22 and 23, 2002, Dr. Edwards' office called Ms. Keeler requesting approval for left knee surgery; on the 23rd, Ms. Keeler denied approval in the absence of sufficient documentation that the left knee injury was related to the right knee injury.
On February 11, 2002, Ms. Pugh returned to Dr. Edwards with "burning" in the left knee and the doctor reported that "[E]xam today is consistent with rather significant chondromalacia (of the left patella)." He also wrote that she was "totally incapacitated at this time." Dr. Edwards performed arthroscopic surgery on Ms. Pugh on February 13, 2002.
In his deposition, Dr. Edwards responded to questions from counsel for Casino Magic about Ms. Pugh's knees:
Q: With regard to the surgery that you ultimately did on the left knee, once you got in there do you have any opinion with regards to the cause of those conditions?
A: No, I thinkI mean, there is no way I can say, you know, that this was secondary to any specific event. The findings were consistent with the stress that you put on your knees. Some of that occurs in the normal process of time. Some of it occurs to what you do or how you do it. I think the average NFL football player has a much higher instance of traumatic arthritis in the knee, whether they have ever had knee surgery, than the average population. I would estimate people who do sedentary work probably have less problems with their knees than people who stand on a concrete surface eight or ten hours a day. So I think a lot of it has to do with your activities. Injury is a factor.

I think probably an overwhelming factor is genetics. I mean, how good your cartilage is to start with. Obviously, some people have better cartilage than others, and I think that comes from genes. That's why we ask a lot of times do you have a family history of arthritis, and it is amazing how many people come in at 65 or 70 and have knees that are gone basically or worn out, no history of injury, no history of anything, but they are, yes, my mother had that or my dad had that. So I think genetics plays a huge role.

Q: That would even be supportive in this case if it was found that she has had a history of arthritis before this?
A: I think those are factors, you know, I think that always has to be a factor. I think she has got some changes in her knee that I considered her relatively young, she is younger than I am. And, you know, I have concern about what is going to transpire over the next 10 years with her standing on her feet all the time. We have talked a little bit about that.
. . .
Q: But medically in connection with the left knee, I meant
A: Was this all about her right knee, is that what you are asking me?
Q: Right.
A: I think that I can't say that if we hadn't done-if she hadn't had any *1205 problems with her right knee that at some point in time she would have problems with her left knee. Was this brought on by shifting weight, I don't know. I can't say that. I can't say a definite on that, but I do think it's a factor, yes, I do. I think that it's a natural thing if you have one extremity that you use the other one more if it bothers you in some way.

Q: But we have also talked about the other factors. Number one, I mean, she is a dealer. She deals cards and she stands on her feet all day. That's a factor?
A: Sure.
Q: And she is also predisposed to arthritis which you don't know technically, but assuming that she was, that would be certainly a large factor?
A: Well, it's a factor. I think all these things put together are. (Emphasis added.)
The trial was held on August 8, 2002.[1] On September 25, 2002, judgment was rendered in favor of Casino Magic; the WCJ concluded that Ms. Pugh failed to prove by a preponderance of evidence that her left knee injury was causally related to her June 18, 2000, work accident at Casino Magic and denied all of her claims on that basis. Ms. Pugh appeals devolutively.

Discussion
An employee is entitled to compensation benefits for injuries arising out of and in the course of her employment. La. R.S. 23:1031(A). The employee has the burden of proving, by a preponderance of the evidence, that her disability is related to an on-the-job injury. Walton v. Normandy Village Homes Association Inc., 475 So.2d 320 (La.1985); Stevens v. Wal-Mart Stores, 27,977 (La.App.2d Cir.11/01/95), 663 So.2d 543.
An employer takes a worker as it finds her, and a worker who is more susceptible to injury is entitled to no less protection under the act than a healthy one. Allor v. Belden Corp., 393 So.2d 1233 (La.1981). In other words, a worker's pre-existing condition does not bar her recovery under the Louisiana workers' compensation statute. Harvey v. B E & K Construction, 30,825 (La.App.2d Cir.08/19/98), 716 So.2d 514. Workers' compensation is to be liberally construed in favor of coverage. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.07/01/97), 696 So.2d 551.
Causation is not necessarily and exclusively a medical conclusion; it is usually the ultimate fact to be found by the court, based on all the credible evidence. Haughton v. Fireman's Fund American Insurance Companies, 355 So.2d 927 (La. 1978).
Factual findings in workers' compensation cases are subject to the manifest error/clearly wrong standard of review. If the WCJ's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Banks, supra; Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
*1206 We note that on May 17, 1999, prior to any accident, Ms. Pugh complained of pain in both knees to her general practitioner, Dr. John Chandler, who referred her to Dr. Robert Goodman, a rheumatologist. Ms. Pugh reported to Dr. Goodman that her mother had arthritis. X-rays of Ms. Pugh's knees in June 1999 revealed a slight medial compartment narrowing with minimal sclerosis and degenerative changes of both knees. Dr. Goodman's impressions at that time were that Ms. Pugh suffered from osteoarthritis and trochanteric bursitis.
Furthermore, we note that Ms. Pugh was 52 years old and weighed around 200 pounds when she was injured at Casino Magic. Her treating physician opined that normal wear and tear, prolonged standing, and a genetic pre-disposition to arthritis may have contributed to Ms. Pugh's left knee problems as well as weight-shifting from her injured right knee.
Ms. Pugh left her job at Casino Magic in December 2000 to become a dealer at Hollywood Casino. This new position required her to stand. It was ten months later that she first had problems with her left knee. Dr. Edwards could not say that the weight-shifting caused the left knee problem. Instead, Dr. Edwards opined, "I think all these things put together are (factors)." The WCJ evaluated all the evidence and found that claimant failed to prove causation by a preponderance of the evidence. We cannot say that the WCJ's decision was unreasonable in light of the record reviewed in its entirety. Banks, supra; Stobart, supra.

Conclusion
For the above reasons, we AFFIRM.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, C.J., WILLIAMS, GASKINS, CARAWAY, and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] On April 4, 2002, the WCJ rendered judgment in connection with the June 18, 2000, work injury to claimant's right knee. The WCJ awarded Ms. Pugh one week of TTD benefits and 12.25 weeks of permanent partial disability benefits but denied her claim for supplemental earnings benefits. The WCJ also found that the shuttle bus incident was "unrelated to the June 18, 2000, work accident" and rejected Ms. Pugh's claim for medical expenses from Casino Magic for the shuttle bus incident. This judgment was not appealed.