bPEATROSS, j.
This appeal arises from a workers’ compensation judgment in favor of Defendant, Cross Roofing and Construction (“Cross Roofing”), denying workers’ compensation benefits to Plaintiff, Louis C. Mays (“Mays”). Mays now appeals the judgment. For the reasons stated herein, we affirm.
FACTS
On January 14, 2002, Mays commenced work for Cross Roofing in Shreveport.[1] Ken “Blue” Cross (“Cross”) is president of Cross Roofing and hired Mays as a hot tar pot operator on a commercial job. The commercial job was delayed, so Mays and a crew of roofers were sent to work on a job replacing a roof on an existing Shreveport residence. When the roofers arrived at work, they all signed in on a time sheet in the front office; next to the time sheet was a large yellow placard instructing them to immediately report any injury to, their supervisor. The roofers rode to and from the job site together in a truck. Once at the job site, Mays was assigned general ground cleanup duties; as the roofing crew removed the existing shingles from the roof deck and threw them to the ground, Mays picked up the shingles and. carried them to a truck for disposal. While performing these tasks over several days, Mays allegedly received injuries when he stepped on some nails at the job site. Subsequently, he filed a claim with Cross Roofing’s workers’ compensation insurance company, which was denied. Thereafter, Mays filed a disputed workers’ compensation claim with the Office of Workers’ Compensation against Cross Roofing, claiming that hisD alleged work-related injuries led to the amputation of his left leg below the knee.
The matter went to trial on May 1, 2003. Mays, who was wearing tennis shoes on the days he claimed he stepped on nails at the job site, testified' that the ground at the job site was covered with nails and that, on the first day of work, he stepped on at least one nail that penetrated the sole of his left shoe and injured his foot. Mays stated that he removed the nail from his foot and kept working, but “doctored” his foot that night. He did not report any injury to his supervisor. According to Mays, he returned to the job site the next day and stepped on “three or four” “eight-penny” nails[2] that nearly went entirely through his left foot. He testified that Cross was present at the job site and saw him pulling nails out of his “feet;” however, Cross denied this and further denied that Mays complained of, or reported, any foot injury. Mays testified that he continued to work after pulling out the nails and that that night his roommate, Geneva Pennington, treated his wounds. He did not report any injury to his supervisor.
The next day, January 16, Mays again returned to work at the job site where he said that, near the end of the day, he stepped with his left foot on at least three more nails. He stated that he left three nails in his shoe rather than pull them out and that, during the ride back to the shop with the other roofers, he took his shoe off with the nails still lodged in the sole and left them in the shoe. Mays testified that, during these three days, he never got[3any nails in his right foot, only in his left foot. He did not report any injury to his supervisor.
*1195 Mays suffers from diabetes (since at least 1994), high blood pressure and congestive heart failure (diagnosed in 1993) and has had extensive and ongoing medical treatment for these conditions for years. Medical records reveal that these conditions were often poorly controlled by diet or medication. Mays repeatedly denied that he was having trouble from his diabetes when he went to work for Cross Roofing, although medical records from July 2001 show that his diabetes was poorly controlled at that time and he admitted that he sought treatment for pain in his left foot prior to working for Cross Roofing. As a result of his condition, Mays has worked only irregularly, if at all, since 1994. His medical records show occasional complaints of pain in both his feet.
The shoe in question that Mays wore to the job site was introduced into evidence at the trial. Mays testified that he left the nails in the shoe until he delivered the shoe to his attorney. Private investigator Richard Turner examined the shoe and removed the nails, marking them for identification at the time. The shoe contained three different types of nails. In the center of the shoe there was a felt nail or button cap nail with an orange plastic circular head. Near this nail, but slightly closer to the toe, there was a 7/8" roofing nail. Approximately two inches from the toe of the shoe there was a 1 1/4" nail.[3] On the inside of the shoe in the insole, there was a hole through the shoe corresponding with the position of this 1 1/4" | ¿nail; surrounding this hole is a stain on the insole that could be blood. No other stains of any type are apparent on the shoe’s insole. Neither the insole nor the sole of the shoe has any obvious evidence of other punctures. Cross testified that 1 1/4" nails would have been present at the job site where Mays was working due to the type of roof involved and that there could also have been felt nails, but that they would not have encountered 7/8" nails at this site because those nails are used for a different type of roof.
Two of Mays’ co-workers, Larry Marshall (“Marshall”) and Ben Murray (“Murray”), testified regarding their recollection of the events at the job site. Marshall recalled that Mays told him that he was in pain, but he interpreted this to mean that Mays was sore because he had not worked for a long time. Marshall, who rode in the truck with Mays to and from the job site, did not recall Mays ever taking his shoe off or complaining of foot injuries. Murray was the foreman on the job site where Mays worked; like Marshall, Murray did not remember Mays complaining of any foot injury or stepping on any nails. Both men said that they would have remembered such an event if it had happened.
Mays returned to work on Thursday (wearing different shoes), but the crew did not work that day because it was raining. He stated that he went home that morning with his foot badly swollen. Murray testified, however, that Mays did not complain of foot trouble that day. Mays did not work again for Cross Roofing. He came in the next week to pick up his paycheck and testified that Cross saw that he was limping and that his foot was swollen.
| .¡Mays’ left foot did not improve over the next week; and, on January 28, 2002, he went to the emergency room at LSU Medical Center for treatment. Medical records show that Mays told doctors that he had injured his foot with nails on the roofing job; doctors there diagnosed Mays with gangrene and amputated a portion of his left foot. This operation did not com *1196 pletely resolve the condition and doctors performed a second operation to amputate Mays’ left leg below the knee.
Some months later, Mays returned to the Cross Roofing office with Ms. Pennington. Mays testified that he showed Cross his injury and that Cross began cursing him, went into the warehouse to get a gun to shoot him and tried to force Mays’ car door open to “jump on” Mays. Ms. Pennington agreed with this version of events. Cross recalled the visit differently; he testified that Mays asked if he had insurance and that he told Mays he did, but that he had not seen him in six or seven months. He admitted that he then asked Mays to leave, but denied cursing him. Murray overheard part of this encounter and testified that Mays said, “you’re going to have to take care of me” and that Cross told Mays to get off of the property or get a lawyer. Murray said that he did not hear Cross cursing Mays.
After hearing all of these witnesses, the Workers’ Compensation Judge (“WCJ”) took the matter under advisement and subsequently denied Mays’ claim with written reasons. The WCJ found that the medical records directly contradicted Mays’ testimony that his diabetes was improved when he went to work for Cross Roofing and that he had not suffered from foot and leg pain. Further, the WCJ noted that Mays’ co-workers could not 1 ^corroborate his testimony that he had shown his co-workers his swollen foot in the truck on the way back from the job site. The WCJ also noted Cross’ testimony that Mays never reported any accident to the company, but returned only several months later asking about insurance. Finally, the WCJ concluded by finding that Mays had not proved that he suffered an accident at work since he was not a credible witness and he lacked corroborating evidence to support his argument. Mays now appeals.
DISCUSSION
We review the findings of fact by a WCJ under the “manifest error” standard. Doucet v. Baker Hughes Production Tools, 93-3087 (La.3/11/94), 635 So.2d 166. The issue is not whether the WCJ was right or wrong, but whether the factual conclusion was reasonable. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Stevens v. Wal-Mart Stores, Inc., 27,977 (La.App.2d Cir.11/1/95), 663 So.2d 543. Mere conflicts in evidence will not suffice to overturn a WCJ’s reasonable evaluations of credibility and reasonable findings of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra; Taylor v. Garrett, 28,729 (La.App.2d Cir.10/30/96), 682 So.2d 831. The manifest error/clearly wrong standard of review is whether the WCJ’s findings are reasonable in light of the record reviewed in its entirety. Pugh v. Casino Magic, 37,166 (La.App.2d Cir.4/11/03), 843 So.2d 1202.
|7The worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992). A worker’s testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged incident. Id. Corroboration of the worker’s testimony may be provided by the testimony of fellow workers, spouses or friends or by medical evidence. Id.
*1197 In the case sub judice, Mays’ left shoe shows evidence consistent with a puncture wound and subsequent foot injury. One such injury could suffice as an “accident” within the meaning of the workers’ compensation law provided that the WCJ otherwise accepts the worker’s testimony. In this case, the WCJ did not accept the claimant’s testimony because the physical evidence, the medical evidence and the testimony of co-workers discredit Mays’ story of the alleged “accident.”
Mays described in his testimony numerous serious nail injuries to his left foot, including several instances where 3-inch-long nails pierced through his left shoe into the sole of his foot and nearly out of the top of his foot. Mays’ shoe, however, bears evidence of only one allegedly injurious puncture wound to the foot instead of the numerous serious wounds that he claimed to have suffered. Moreover, at trial, Mays testified that Cross saw him pulling nails out of his “feet,” but we point out that surely it would have | sbeen extremely difficult, if not impossible, for Mays to remove his shoe with the nails still embedded in his foot. Further, Mays did not report any injury to his supervisor. We also note that Mays miraculously escaped from stepping on any nails with his right foot. It seems unusual that all the nails he allegedly stepped on were with his left foot only.
Moreover, Mays’ medical records reveal a long history of problems with his feet related to his diabetes and are rife with observations that his diabetes was poorly controlled. Mays submitted no evidence at trial that his injury was a result of the alleged puncture wound from the nail rather than his preexisting medical problems. Finally, none of Mays’ co-workers observed the extraordinary series of injuries that he claimed to have suffered or, indeed, observed any injury to his foot at all. The testimony, medical records and other evidence do not support Mays’ claim or satisfy his burden of proof to establish that he suffered a work accident that resulted in disability. The WCJ’s findings are reasonable in light of the record reviewed in its entirety. Upon the record as a whole, we find no manifest error in the trial court’s decision not to credit the testimony of the claimant.
CONCLUSION
For the foregoing reasons, the judgment of the WCJ against Plaintiff, Louis C. Mays, is affirmed. Costs of this appeal are assessed to Mr. Mays.
AFFIRMED.

. Mays is a roofing laborer with a ninth-grade education.

. Mays said that he stepped on eight-penny nails, but also said that eight-penny nails are more than three inches long. Eight-penny nails are two and one-half inches long..

. There was some dispute about the position of the nails in the shoe after it was delivered to the attorney's office, but it is unclear how, or if, the nails were moved.