MARION F. EDWARDS, Judge.
 

 12Plaintiff/appellant, Rita Dorion (“Do-rion”), appeals a judgment of the Office of Workers’ Compensation (“OWC”) dismissing with prejudice her claim for benefits, penalties, and attorney’s fees.
 

 In October of 2004, Dorion filed a disputed claim for compensation alleging that she was injured in the course and scope of her employment with Gulf States Asphalt Company, L.P. (“Gulf States”) and that her injuries developed over time as a result of heavy lifting. Gulf States and the Louisiana Workers’ Compensation Corporation (“LWCC”) filed an answer and general denial, averring, in part, that there was no alleged date of an accident. Trial in the matter was ultimately set for April 4, 2008, following which the OWC judge determined that there was no evidence of record regarding the work required by Gulf States, such as what objects Dorion had to lift, how often or how heavy they were, and whether she was standing, stooping, etc. The court found that no specific accident took place as is defined by LSA-R.S. 23:1021 and required by LSA-R.S. 23:1031. Further, the court stated that “[s]ome physicians have found that Ms. Dorion suffers from a |3degenerative disc disease,” which condition was specifically excluded by LSA-R.S. 23:1031(B). The court, thus, dismissed her petition.
 

 Dorion began working at Gulf States some time in 1998. Prior to- her employment at Gulf States, she worked on an assembly line at Intralox Company for nine years, during which employment she developed carpal tunnel syndrome. She became pregnant and stopped working, and, as a result, her symptoms disappeared. Dorion testified that, in 2003, she began having severe headaches, tension, and numbness in her hands, and severe pain in her left elbow. MRIs taken on April 4, 2003 and on August 1, 2003 indicated cervical spasm and a degenerative fifth cervical disc. .
 

 In February 2004, Dorion continued to experience pain in her left shoulder and her neck but then began to suffer from severe headaches and vomiting. She asked for and received a leave of absence. Dorion went to the emergency room at West Jefferson Hospital and was told to see a neurologist. According to Dorion, she eventually sought treatment from Dr. Dhanpat Mohnot (“Dr. Mohnot”), who diagnosed her with a herniated disc, a pinched nerve in her neck, and arthritis, as well as carpal tunnel syndrome. She gave her employer the medical reports from both Dr. Mohnot and Dr. Ralph Katz (“Dr. Katz”), an orthopedist. Upon receipt of the medical report, Gulf States cancelled Dorion’s health insurance and terminated her employment.
 

 A number of medical records were entered into evidence. Dr. Meyer Sutton (“Dr. Sutton”) treated Dorion in January and February of 2004 for various complaints, including headaches, pressure in her neck, and numbness in her hands. Dr. Sutton did not provide a diagnosis but noted Dorion had previously been diagnosed with carpal tunnel syndrome. Dr. Sutton referred her to Dr. Mohnot.
 

 
 *47
 
 Lin March of 2004, Dorion saw Dr. Moh-not at the New Orleans Headache and Neurology Clinic for complaints of severe headaches, neck pain, and dizziness. Dr. Mohnot ordered an MRI and an EEG. The MRI showed disc protrusions at C4-5 and C5-6 causing spinal lateral recess and .stenosis. There was no diagnosis of a neurological disorder by Dr. Mohnot but one of his diagnoses was cervical degenerative disc disease. Dr. Mohnot referred Dorion to Dr. Katz at the Westside Orthopedic Clinic for further evaluation of her neck and arm pain.
 

 Dr. Katz noted that his examination, the MRI, and X-rays indicated some cervical disc protrusion at C4-5 and C5-6, with some stenosis. He further determined that Dorion suffered with carpal tunnel syndrome and “[diffuse posterior cervical pain which appears to be muscular with associated left-sided trapezial muscle pain,” and possible tension headaches. She was treated conservatively with medication and referred back to Dr. Mohnot for a nerve conduction study.
 

 In March of 2005, Dorion went to Hou-ma Hospital and saw Dr. Morteza Shams-nia (“Dr. Shamsnia”), a neurologist. Dr. Shamsnia ordered another MRI and EMG. The MRI taken at that time showed disc herniation at C4-5. He testified that, with a degenerative disc, an event occurs that causes the disc, which is like a cushion, to lose water and change shape, moving out of place or collapsing on another disc. With a herniated disc, the cushion moves and comes out. A herniated disc can lead to degenerative disc disease and vice-ver-sa. The number of spinal discs involved can determine the type of injury and, in degenerative disc disease, multiple levels of discs are involved. The discs which evidence “wear and tear” are higher up, at C5-6 and 6-7. Because Dorion’s herniation was higher up, it was “against natural wear and tear.” Dr. Shamsnia testified that carpal tunnel syndrome can affect posture, the way the arm is held and used, and, thus, can put | ¿pressure on the neck. He opined that, in Dorion’s case, absent evidence of an accident or evidence of an earlier disc disease, the carpal tunnel syndrome affected her posture and put pressure on her neck, causing the herniated disc. The carpal tunnel syndrome and the resultant cervical problem developed over a long period of time. Dr. Shamsnia was still Dorion’s treating physician at the time of trial.
 

 Dr. Stefan Pribil (“Dr. Pribil”), a neurosurgeon, testified via deposition. He examined Dorion on June 9, 2006 for neck and bilateral arm pain. Dorion told him she worked an assembly line approximately six years, lifting anywhere from ten to 100 pounds. Dr. Pribil examined Dorion and reviewed her records, including the MRI, and diagnosed Dorion with hernia-tions at C4-5 and C-5-6. He believed that the repetitive assembly line work contributed materially to the development of carpal tunnel, shoulder, and cervical disc problems. Degenerative disc disease develops over time, and he felt that Dorion’s entire condition “happened over a ... long period of time, yes, chronically developed.” Dr. Pribil recommended an angio-cervical discectomy.
 

 Dr. Eric George (“Dr. George”) performed carpal tunnel release surgery on Dorion and found that, as of May 12, 2006, she was at maximum medical recovery.
 

 In workers’ compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC’s findings of fact is the “manifest error-clearly wrong” standard.
 
 [1]
 
 Under the manifest er
 
 *48
 
 ror standard, the appellate court must determine whether the workers’ compensation judge’s factual findings are reasonable in light of the record reviewed in its entirety.
 
 [2]
 
 The determination of | ¿whether injury occurred in the course and scope of employment is a mixed question of law and fact.
 
 [3]
 

 The judgment here contains errors of both fact and law. In her deposition in the record, Dorion testified that, in her job as an assembly worker, she cut and packed rolls of weatherproof sealant tape into boxes. For one hour she had to wind the roll of tape on the conveyor. She would have to sit down and roll the tapes, box the containers, and put the boxes on a pallet. Ten five-pound boxes were packaged into one larger box, and she would put those larger boxes on the pallet. The pallet would hold thirty or forty large boxes, which were then transferred to a forklift. The history taken by Dr. Pribil supported her testimony. Therefore, the record does not support the determination by the court that there was no evidence of the work required of Dorion by Gulf States.
 

 Further, when legal error interdicts the fact-finding process in a workers’ compensation proceeding, the de novo, rather than the manifest error, standard of review applies.
 
 [4]
 
 Likewise, “[t]he interpretation of statutes pertaining to workers’ compensation is a question of law and warrants a de novo review to determine if the ruling was legally correct.”
 
 [5]
 
 Because we find that the trial court also committed legal error in its interpretation of the workers’ compensation laws, we review the matter de novo.
 

 The Workers’ Compensation Act is to be liberally construed in favor of protecting workers from the economic burden of work-related injuries.
 
 [6]
 
 Generally, an injured employee is entitled to receive benefits for an injury that arises out of and in the course of his employment. LSA-R.S. 23:1031. ^Specifically, LSA-R.S. 23:1031.1 governs workers’ compensation claims for occupational disease. In 2004, LSA-R.S. 23:1031.1, in relevant part, read:
 

 A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
 

 B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment
 
 in
 
 which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occu
 
 *49
 
 pational disease for the purpose of this Section.
 

 Prior to the legislative extension of workers’ compensation coverage to include occupational diseases, a worker’s entitlement to compensation hinged on the occurrence of an “accident,” which can only be established by the heightened burden of proof by the claimant of an “identifiable precipitous event” that caused injury.
 
 [7]
 
 While enlarging workers’ compensation coverage to eases of occupational disease, LSA-R.S. 23:1031.1 retains the requirement that an employee establish the disease arises from his work, i.e., from “causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.”
 
 [8]
 
 Thus, the claimant must show that he contracted the disease at issue during the course of his employment and that the disease was the result of the nature of the work performed. The causal link |8between a claimant’s illness and his work-related duties must be established by a reasonable probability; the claimant fails in his burden of proof upon a showing of only a possibility that the employment caused the disease or that other causes not related to the employment are just as likely to have caused the disease.
 
 [9]
 

 Gulf States does not contest the fact that Dorion’s carpal tunnel syndrome was the result of her employment, and, in fact, has paid some benefits for that condition. Rather, Gulf States’ position at trial was that Dorion’s inability to work is the result of degenerative disc disease, which is specifically excluded from coverage as an occupational disease under LSA-R.S. 23:1031.1.
 

 Nevertheless, that statute also clearly states that an occupational disease shall include injuries due to work-related carpal tunnel syndrome. Dr. Shamsnia, Dorion’s treating physician, opined that Dorion’s ruptured or herniated cervical discs were the result of the changes in posture and pressure on her neck caused by her carpal tunnel syndrome. None of the medical testimony contradicts Dr. Shamsnia’s conclusion that carpal tunnel led to Dorion’s subsequent injuries, whatever the diagnosis of the injuries may have been. Contrary to Gulf States’ assertion and the finding of the trial court, only one physician, Dr. Mohnot, diagnosed Dorion’s problem as degenerative disc disease. At least two Louisiana circuit courts have indicated that other injuries resulting from carpal tunnel syndrome are compensable.
 
 [10]
 
 Based on the record, we find the herniated discs are injuries due to work-related carpal tunnel syndrome. That Dorion’s cervical problems developed over time does not require the conclusion that her problems were caused by degenerative disease, nor lessen the fact that these were injuries sustained as a result of carpal tunnel syndrome.
 

 [^Additionally, in Louisiana it is well-settled that an employee’s disability is compensable if a pre-existing condition or
 
 *50
 
 disease is activated or precipitated into a disability manifestation as a result of work.
 
 [11]
 
 It is also axiomatic that an employee’s work injury is presumed to have aggravated, accelerated, or combined with his preexisting disease or infirmity to produce his disability when the employee proves that, before the accident, he had not manifested disabling symptoms but that commencing with the accident the disabling symptoms appeared and manifested thereafter and medical or circumstantial evidence indicates a reasonable possibility of a causal connection. An occupational disease which causes disability in that manner is equally compensable.
 

 At trial, Ms. Thea Smith, a claims representative for the LWCC, testified that compensation benefits were initially denied because the injuries claimed were “cervical” and there was no report of an accident. At no time did LWCC request Do-rion to consult a physician of its choice.
 

 LSA-R.S. 23:1201(F) grants a claimant the statutory right to penalties and attorney’s fees for all unpaid compensation and medical benefits. The section does not apply if the claim is reasonably controverted. The test to determine whether the employee’s right to benefits was reasonably controverted is whether, given the facts, medical and otherwise, known to the employer or his insurer, did the employer or insurer have a reasonable basis to believe that medical expenses and compensation benefits were not due the employee. Stated another way, did the employer or his insurer have sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant.
 
 [12]
 
 Here, the medical records available to Gulf States prior to trial discussed cervical 1 ^herniations with no particular link to carpal tunnel syndrome. Attorney’s fees should not be imposed in doubtful cases, where a bona fide dispute exists as to the employee’s entitlement to benefits, and the mere fact that an employer loses a disputed claim is not determinative.
 
 [13]
 
 In the absence of an identifiable accident, it was not unreasonable to counter Dorion’s claims of cervical injuries. We, thus, decline to award penalties and attorney’s fees.
 

 For the foregoing reasons, we reverse the judgment of the trial court dismissing Dorion’s case and remand the matter for further proceedings.
 

 REVERSED AND REMANDED.
 

 [1]
 

 .
 
 Dean v. Southmark Const.,
 
 03-1051 (La.7/6/04), 879 So.2d 112 (citations omitted).
 

 [2]
 

 .
 
 Pugh v. Casino Magic,
 
 37,166 (La.App. 2d Cir.4/11/03), 843 So.2d 1202,
 
 reh'g denied.
 

 [3]
 

 .
 
 Dean v. Southmark, supra.
 

 [4]
 

 .
 
 MacFarlane v. Schneider Nat'l Bulk Carriers, Inc.,
 
 07-1386 (La.App. 4 Cir. 4/30/08), 984 So.2d 185 (citing
 
 Brantley v. Delta Ridge Implement, Inc.,
 
 41,190, p. 8 (La.App. 2 Cir. 6/28/06), 935 So.2d 308, 314).
 

 [5]
 

 .
 
 MacFarlane, supra
 
 (citing
 
 Lirette v. Patterson Serv., Inc.,
 
 05-2654, p. 4 (La.App. 1 Cir. 11/17/06), 951 So.2d 223).
 

 [6]
 

 .
 
 Winford v. Conerly Corp.,
 
 04-1278 (La.3/11/05), 897 So.2d 560.
 

 [7]
 

 .
 
 See, Thomas v. Alliance Compressors,
 
 04-1034 (La.App. 3 Cir. 12/8/04), 889 So.2d 424,
 
 writ denied,
 
 05-0086 (La.3/18/05), 896 So.2d 1010 (citing
 
 O'Regan v. Preferred Enter., Inc.,
 
 98-1602, pp. 10-13 (La.3/17/00), 758 So.2d 124).
 

 [8]
 

 .
 
 Id.
 
 (citing
 
 Coats v. Am. Telegraph Co.,
 
 95-2670 (La. 10/25/96), 681 So.2d 1243).
 

 [9]
 

 .
 
 Id.
 

 [10]
 

 .
 
 See, e.g., Shields v. GNB Technologies, Inc.,
 
 33,911 (La.App. 2 Cir. 10/4/00), 768 So.2d 774.
 
 See, also Elliott
 
 v.
 
 OMSI,
 
 97-71 (La.App. 3 Cir. 4/30/97), 693 So.2d 847,
 
 writ denied,
 
 97-1841 (La. 10/17/97), 701 So.2d 1327.
 

 [11]
 

 .
 
 Jackson v. Wal-Mart Stores, Inc.,
 
 03-1054 (La.App. 5 Cir. 2/10/04),
 
 868
 
 So.2d 813.
 

 [12]
 

 .
 
 Ziegler v. Bagby Constr./LWCC,
 
 99-1120 (La.App. 5 Cir. 4/25/00), 760 So.2d 513, 520,
 
 writ denied,
 
 00-C-1458, (La.6/30/00), 766 So.2d 544.
 

 [13]
 

 .Parker v. ADM Milling Co.,
 
 01-649 (La.App. 5 Cir. 11/27/01), 804 So.2d 120.